[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This action concerns the custody and visitation of eight-year-old John Iacobucci The plaintiff, his father, and the defendant, his mother were never married to each other Johnny has always lived with his mother. His father has visited with him consistently throughout the years.
The plaintiff has now moved for custody of the child. The issue was tried to the court over eleven days, with full participation by each party, represented ably by counsel and with the child represented by counsel as well. For reasons that are stated in this opinion, the court finds that the plaintiff has carried his burden of showing that it is i the child best interests that there be a change in the custody and visitation arrangement Accordingly, custody of the minor child is awarded to the father with rights of reasonably visitation to the mother as set forth herein.
BACKGROUND CT Page 6500
John Iacobucci, Jr. (called Johnny throughout this opinion) was born on June 16, 1989. His father and mother dated over a number of months but did not marry and never lived together. At first, the plaintiff was doubtful that the child was his. The parties discussed terminating the pregnancy. Eventually, after Johnny's birth, the defendant sought to establish that the plaintiff was, indeed, the father. The parties cooperated in genetic testing and the plaintiff thereafter acknowledged paternity. The parties then agreed to a child support order, an order with which the plaintiff has complied faithfully ever since.
The first overture about visitation came from the defendant who, having been initially rebuffed by the plaintiff about contact with the child, suggested that the plaintiff could begin seeing the child. Visitation began without the intervention of any court orders when Johnny was a toddler. At that time, the defendant was involved in a live-in relationship with a boyfriend, whom the child began to view as his father. That relationship did not last. The boyfriend moved out when Johnny was about sixteen months old, although the defendant continued to date the boyfriend for a year or so thereafter.
The defendant now lives with her son, her mother and step-father in a two-bedroom apartment. She works four days a week as a chiropractic assistant.
The plaintiff is employed as a funeral director. Recently he has invested as partner in the ownership of a second funeral home that he hopes will provide him with additional income. He lives with his parents and his brother in a home that is owned by his parents.
This litigation started in February 1992, after the plaintiff had begun to experience problems in getting the defendant to cooperate in allowing regular visitation with Johnny Although the first court order was entered in March 1992, approving a stipulation of the parties to a visitation schedule, the agreement broke down within a month thereafter.
Johnny turned three years old in June of 1992. Shortly thereafter, the parties were ordered to attend mediation arranged through the Family Services Unit of the Superior Court. They were unable to reach a new agreement. In early 1993, Attorney Mark CT Page 6501 Soboslai was appointed to represent Johnny. In March of 1993, Johnny's attorney recognized that the visitation problems were severe and pervasive, and that they were having alarming consequences for Johnny. Johnny's attorney filed a motion on April 1 1993, to refer the matter to the Yale Child Study Center to evaluate "the child's custodian placement" and "to determine whether a change of custody is warranted under the fact and circumstances of this case." Document #114. The court ordered such an evaluation later that month. In June 1993, the parties once again reached a multi-page comprehensive agreement providing for joint legal custody with a precise visitation schedule for the child with the father. Problems with visitation continued although the plaintiff refrained from filing contempt motions in court for most of 1994 and 1995.
On March 18, 1996, the plaintiff assaulted the defendant with his hands at his home. The boy witnessed the assault. Visitation did not occur for a number of months, but resumed through the intervention of Johnny's pediatrician who recognized that the boy needed to come to terms with the frightful events he had witnessed.
Later that summer Johnny went for his first extended vacation with his father, a trip to California to meet his cousins and to visit Disneyland, a visit that the defendant vehemently opposed. Her defiance of the court order for this visit and her violent resistance to it, necessitating police intervention to pry the boy from her arms, once more caused Johnny's counsel to file a motion asking the court to consider changing custody of the child. The plaintiff also filed a motion for custody. Thereafter the parties agreed to a psychiatric evaluation to be performed by Dr. Joseph Saccio, who has been an important witness in this trial. The parties have recently cooperated in providing therapist for Johnny, Dr. Ellis Perlswig, who has not been a witness but who has been and it is hoped will continue to be, an out-of-court resource for Johnny and his parents
THE VISITATION CONFLICT
Visiting times were filled with problems right from the beginning of Johnny' relationship with his dad. The child had great difficulty separating from his mother Although she told the child verbally that he must go with his father, her unspoken conduct conveyed quite a different message to the child. She lavished physical affection on the child at these times. Her CT Page 6502 words to the child, and the words of her family and boyfriend to the child, were that the father was not someone whom the child should fear. Unfortunately this suggested to the child that in fact there was something of which to be fearful should he go with the plaintiff, and the child resisted all the more. Other comments that created anxiety for the child were of a similar nature: although the father wasn't there for the mother when Johnny was younger, it was okay to go with the father now; or, if you don't go, I'll make you go (indicating that the visit was a kind of punishment). The defendant also did not like to hear the child cry, to such an extent that if the child cried when it was time to go with the father for a visit, the mother often would withhold the child from the father, cuddling and rocking the child, kissing and soothing him, and the visit would simply not take place.
Johnny was also made aware by the defendant of the controversies in the early relationship of the plaintiff and defendant. At one point, the plaintiff had offered the defendant financial assistance should she choose to terminate her pregnancy. He wrote a check to a provider of abortion services and gave it to the defendant. The defendant has kept this check to this day and has shown it to whoever she feels needs to be convinced of the rightness of her position in this litigation. Most tragically she has shown it to Johnny, explaining that his father never wanted him to be born, a twisted justification for inflicting such pain on the child.
The defendant has a volatile temper. Often when the plaintiff would call to confirm a visitation time, a conversation would ensue in which the defendant would create an argument out of a real or imaginary slight. If she did not get a satisfactory response from the plaintiff, she would shout at him over the phone with the child within earshot, frequently using profanity, and would refuse to allow the child to go on the upcoming visit. This happened so often that it became a pattern, a virtual ritual, and visits were wrongfully denied by the defendant on numerous occasions. Often she would allow the child to choose whether to go on a visit with his father, holding out the alternative to the child to engage in some other inviting activity with a friend or family member, as a means, wittingly or unwittingly, of manipulating the child to choose not to go with the plaintiff.
Nor was the denial of visitation the only behavior of the CT Page 6503 defendant that created anxiety for Johnny. The defendant called the plaintiff's home incessantly while Johnny was with the plaintiff for a visit. While a telephone call during a visit can often be benign, for a child who has already had difficulty in separating from the home parent, such a phone call is likely to be intrusive and disruptive. This was manifestly the case with the defendant's phone calls to the Iacobucci home. Rather than serving to comfort and reassure her son, the defendant's phone calls incited him, making him nervous and weepy, and in some cases causing him to be seized with a tantrum. Worse then, the defendant would use the failure to make successful telephone contact, or her displeasure at something she heard or learned during such a phone call, to interrupt the visit and insist that the boy be brought home immediately. On several occasions, she would show up at the Iacobucci home insisting that Johnny come home with her despite a court order designating that day as a visiting day for the plaintiff. The police were called to intervene in such disputes, at least once telling the defendant to leave the plaintiff's property.
The defendant's stridency was not confined to telephone contact with the plaintiff or to contact with the plaintiff at his home. The child is involved in organized team sports and there have been a number of outbursts by the defendant at games or practice attended by the child. Either she has insisted on seeing and speaking with the child at the activity when it is the father's scheduled time with the child, with the child often decompensating as a result, or she has taunted the father and attempted to engage him i a discussion inappropriate to such a forum, embarrassing the child in front of his peer and other parents.
Typically, the plaintiff has avoided confrontations with the defendant. His reaction over the phone and in person is to try to appease the defendant if he can and to walk away from any provocation on her part. He has also attempted as much as possible to communicate with her in writing, a practice which the defendant views as insulting. Notwithstanding the defendant's claims that the plaintiff has been rude or belittling to her his behavior toward her has been largely passive and benign.
Two events in the spring and summer of 1996 have been the focus of much of the evidence from all litigants at trial. The first are the events surrounding the terrifying assault by the plaintiff on the defendant. The plaintiff has felt helpless and CT Page 6504 frustrated in the many interactions with the defendant over visitation. His view, which is actually shared by the defendant, is that Johnny picks up on and mirrors the defendant's moods If something angers her or upsets her, Johnny becomes angry or upset. The plaintiff has thus adopted a style with the defendant of backing off in the face of any challenge of verbal aggression by her, because he believes any engagement of her will merely escalate, things and make it worse for Johnny.
On March 18, 1996, Johnny had a session with a tutor at the home of the plaintiff The tutor had been retained several months earlier and had been tutoring Johnny for some time. The defendant expressed a desire to meet the tutor and was invited to observe session. Johnny was less than cooperative during the session, and when the session concluded, the tutor asked to speak with the plaintiff privately. The defendant became enraged that the tutor and the plaintiff were conferring outside of her presence. She shouted at the plaintiff and at the tutor, grabbed the child roughly by the arm, said to the child words to the effect "that's the last time you'll ever see anybody in this house (perhaps meaning only the tutor, but also perhaps threatening another interruption visitation), and pulled Johnny out the door. The plaintiff ran after her, grabbed her shoved her into a wall, placed his hands around her throat, and a physical fight of frightening proportions ensued. Neither the defendant nor the plaintiff were badly injured, the plaintiff's family being present to intervene; but the event has left a lasting. impression on the plaintiff, the defendant, and most importantly on Johnny.
The plaintiff had never before or since raised a hand to the defendant. He is entirely remorseful. He views his conduct that day as the worst thing he has ever done in his life. He began individual psychotherapy shortly thereafter.
The defendant views the day as a justification for all her resentment and anger toward the plaintiff. She has reminded the child of the assault frequently since then. She believes that the plaintiff's conduct that day is entirely representative of his true personality.
Johnny remembers it as the day his father tried to kill his mother. He still love his parents but is profoundly confused and distressed about how he fits into their lives He remembers vividly being pushed aside during the fight as he tried to break CT Page 6505 it up. The behavior of both parents that day (the defendant reentered the plaintiff's home immediately after the fight was over and challenged the plaintiff to continue the altercation) has only served to increase his suspicion and mistrust of adults.
The second incident was the aftermath of the hearing in this court before the Hon Lynda Munro on August 14, 1996. Visitation had resumed between Johnny and his father by June 1996, and the plaintiff sent the defendant a letter in July proposing to take Johnny for a week's vacation in August to California. The defendant refused to allow such a visit because she said Johnny would miss her too much and besides, Johnny did not want to go. The plaintiff brought the matter to court, and the issue of the one week visit was the subject of an evidentiary hearing on August 14, 1996. The court allowed the visit, and as the judge began to rule, the defendant was unable to contain herself. Her outburst in the courtroom was so severe that the judge ordered the sheriff to restrain her. Moreover, her demeanor and statements to the court were such that the court actually ordered not just visitation for the plaintiff, but ordered that for the duration of the visit, the plaintiff was to be the custodial parent to allow him to utilize peace officers to enforce the court order if necessary.
Within an hour of the court rendering its decision and order, the defendant was in defiance of it. Rather than have the child ready for pickup later that afternoon, she sequestered the child at her sister's house and refused to let the child go. The police were called, and a two hour police negotiation ensued. The child and the defendant were crying hysterically. The police eventually enforced the order of the court by physically removing the child from the defendant and placing the child in the car of the plaintiff who had been waiting outside the entire time. The child who had been inconsolable, who had threatened to kill himself if he was taken away, immediately became calm upon being placed in the plaintiff's car, and began to ask questions about the impending trip and to express an eagerness to go on the vacation.
The two incidents are emblematic of the chaos that exists in Johnny's life. While the court finds it unlikely that the violence inflicted by the plaintiff against the defendant will ever happen again, the court cannot find on the basis of the evidence that the defendant's desperate and defiant behavior, perhaps equally terrifying to the child, will not recur. CT Page 6506
THE CHILD'S CURRENT SITUATION
Johnny is currently attending parochial school. In the past, the plaintiff has on two occasions attempted to get extra academic help for his son. The first was in 1995-96 with the visiting tutor, of whom the defendant disapproved. The second was during the summer of 1996 after visitation was reinstituted in June. The plaintiff enrolled Johnny in a program at Sylvan Learning Center, but the defendant's failure to keep to the visitation schedule created too many missed tutoring sessions for the program to be of any benefit to the child; and the plaintiff declined to re-enroll him.
At present, Johnny is being treated by a child psychiatrist, Dr. Perlswig. In addition to individual psychotherapy, Johnny has been in counseling with a school social worker in a brief session each week during the school year. He was previously in therapy with a licensed clinical social worker named Karen Manukas for about five months beginning in late 1995. After the plaintiff assaulted the defendant, the defendant precipitously withdrew Johnny from therapy on the grounds that she thought the therapist was too aligned with the father. It is significant that at the defendant's behest, the child was never again to see the therapist with whom he had been consistently treating, and was not provided then with any sort of therapy or crisis intervention after having witnessed only days before a frightening fight between his parents.
THE PLAINTIFF'S POSITION
The plaintiff at first concluded that the child was best living with the defendant an assumed that her behavior around visitation was having an adverse impact only upon his own interests. He gradually became aware that the interruption of his contact with the child was having an adverse effect on the child. He also became convinced that the defendant's parenting style was having overall negative consequences for the child is virtually every aspect of Johnny's life and was not confined simply to outburst surrounding visitation. Moreover, regardless of the cause of Johnny's distress, and the plaintiff's acknowledgement that he may also have contributed to Johnny's feelings c anxiety and depression, the plaintiff believes that the defendant will not or cannot follow through on providing stability for the boy and in getting professional help for Johnny needs. He views himself as the only one capable of providing a reliable and CT Page 6507 stable upbringing for Johnny.
THE DEFENDANT'S POSITION
The defendant's position is that she has only on occasion interfered with the plaintiff's visits, that she has never denigrated the plaintiff in the presence of Johnny, that she has tried to encourage the boy's relationship with his father; but that if he the child doesn't want to go, she is powerless to do anything about it. She does not genuinely believe that her son is emotionally disturbed in any way. She does not see the child' stated reluctance to go on visits as evidence of any trouble to which she may have contributed. Her witnesses stress that she is a loving, caring mother, a situation which the court also concludes is so. She has provided for Johnny's physical care. She believes that if Johnny goes to live with the plaintiff, Johnny will be taught to disrespect women to "use" them. She believes that now that she and the plaintiff, with the help of Johnny's therapist, have been able to avoid direct communication with one another and keep to a set schedule, everything is better and there is no need for a change.
THE POSITION OF CHILD'S COUNSEL
Johnny states to everyone that he wants to continue living with his mother. He expresses joy about visiting with his father. He is not capable of realistically viewing any situation for himself except the one in which he now finds himself. His parents are unable to cooperatively make joint decisions on his behalf. The child's counsel suggest that the court put great weight on the comprehensive report and evidence provided by Dr. Joseph Saccio.
CONCLUSIONS
The court finds that not only has the defendant not cooperated in facilitating contact between Johnny and his father pursuant to agreements that have been reached both in and out of court, but also she has flagrantly defied orders of the court for visitation.
The defendant's defiance of clear court orders, while a significant factor in the court's decision, is not one upon which a decision to transfer custody can rest alone. An award of child custody is not a prize for good behavior; a divestment of custody CT Page 6508 is not a censure for bad, even contemptuous, behavior. Rather the child's best interests are always paramount.
The defendant's interference with the child's relationship with the plaintiff, a relationship to which the child, not just the plaintiff, has a right, is one that the defendant has consistently failed to appreciate. Her interference with that relationship has had adverse consequences for her child's development. Her failure to have the empathy and the self-discipline necessary to foster that relationship bodes ill for her ability to help Johnny meet his other developmental milestones.
Johnny, whether attributable only to the conduct of his parents or for other reasons, is a troubled youngster. He is anxious and mistrustful. He has outbursts that he cannot control. At this time, he is significantly and seriously disturbed. Of great significance to the court in deciding who should have custody of Johnny is that his father recognizes this and his mother does not. The plaintiff has seen disturbing signs in Johnny for some period of time but has been powerless to either convince the defendant of Johnny's needs or to get help for Johnny on his own. The defendant, as the court has partly detailed, has subverted efforts the plaintiff has made to assist Johnny. Her frantic reactions to life's upsets have provided a poor example to Johnny on how to resolve conflict, get along with others, and rely on grownups. As the inevitable crises of adolescence confront Johnny, the defendant is not equipped to guide him through them.
The testimony and written evaluation of Dr. Joseph Saccio was helpful to the court in understanding the source and depth of Johnny's psychological problems. Although the history of tumultuous contact between the parents explains much of Johnny's trouble, it does not account for it all. Another important factor is the way the defendant has raised the child. The primary living situation has been an emotionally unstable one. The defendant ascribes her own needs and feelings to the child. She has no insight into how her behavior adversely affects the child. Johnny has a special need for a stable emotional environment and a more supportive living situation. He needs his care to be directed by a parent who can recognize his needs, plan for these needs to be addressed, and follow through with consistency, love, and support. The plaintiff has attempted to do this for several years under very trying circumstances with minimal cooperation from the CT Page 6509 defendant. While the defendant has begun to alter her style of operating with her son and with the plaintiff in ways that are more positive recently, the likelihood of her being able to handle Johnny's upbringing with consistency, without the constant threat of court action, is remote.
The defendant remains an important fixture in the emotional life of her son. The court cannot emphasize too highly the importance it attaches to the parties adhering to the schedule for visitation and the other requirements in the court order.
ORDERS OF CUSTODY AND VISITATION
1. Custody of the minor child John Iacobucci, Jr., is awarded to the plaintiff father, with rights of reasonable visitation to the defendant mother.
2. The defendant is entitled to visitation each Monday and Wednesday from after school until 7:30 P.M. The mother shall provide transportation for these visits.
3. During the summer or when there is no school, the defendant shall be entitled to visitation each Monday and Wednesday from noon to 7:30 P.M.
4. The defendant shall be entitled to visitation every other weekend from Friday after school, or at 4:00 P.M if there is no school that day, to Sunday at 7:30 P.M.
5. The court order of September 3, 1993, contains a schedule of Holiday time that each party spends with the child. Paragraph 2.1(c) of the parties agreement contained in the court order of September 3, 1993 is hereby made the order of this court relative to holiday visitation. The defendant shall be entitled to spend Mother's Day with the child and the plaintiff shall be entitled to spend Father's Day with the child.
6. The defendant shall be entitled to two weeks of visitation separately or consecutively at her election during the summer. She must elect the weeks she desires in writing to the plaintiff by July 1, 1997, and by May 31 in all subsequent years.
7. The plaintiff shall insure that the child calls and speaks with his mother at least once in every 48 hour period in which the child does not otherwise have contact with the defendant. The CT Page 6510 defendant shall not call the plaintiff's home except in an emergency. She may communicate in writing with the plaintiff. She shall not be entitled to go on the plaintiff's property.
8. During any period in which the child is with the mother on a visit of longer than 60 hours, the defendant shall insure that the child calls and speaks with his father at least once in every 48 hour period in which the child does not otherwise have contact with the plaintiff.
9. The plaintiff's obligation to pay child support to the defendant is hereby terminated. The parties shall promptly schedule with the caseflow office a hearing a which the court shall determine the defendant's child support obligation and any outstanding claims regarding payment of fees attendant to the trial just concluded.
IT IS SO ORDERED.
Patty Jenkins Pittman, Judge